**TWIN TOWERS PLAZA TENANTS
ASSOCIATION, INC., Appel-
lant/Cross–Appellee,**

v.

**CAPITOL PARK ASSOCIATES, L.P.,
et al., Appellees/Cross–
Appellants.**

**No. 04–CV–1534, 04–CV–1575.**

District of Columbia Court of Appeals.

Argued Nov. 16, 2005.
Decided March 23, 2006.

Steven A. Skalet, with whom Jonathan K. Tycko, Washington, DC, was on the brief, for appellant/cross-appellee.

James Bruce Davis, with whom Mitchell B. Weitzman, Raighne C. Delaney, Scott J. Spooner, Arlington, VA, Caroline Petro Gately, Reston, VA, and Marc E. Miller,

Washington, DC, were on the brief, for appellees/cross-appellants.

Vincent Mark J. Policy, Richard W. Luchs, William C. Casano, and M. Ryan Jenness, filed a brief amicus curiae on behalf of The Apartment and Office Building Association of Metropolitan Washington.

Thomas J. Perrelli, Kali N. Bracey, Patricia Mullahy Fugere, Antonia K. Fasanelli, Eric Angel, Barbara McDowell, Jennifer L. Berger, Vytas Vergeer, and Nina Dastur, filed a brief amici curiae on behalf of Bread for the City, Center for Community Change, Central American Resource Center, Coalition for Nonprofit Housing and Economic Development, DC Tenants Association, The Legal Aid Society of the District of Columbia, Washington Interfaith Network, and Washington Legal Clinic for the Homeless.

David H. Cox and Kenneth C. Crickman, filed a brief amicus curiae on behalf of D.C. Land Title Association.

Before WASHINGTON, Chief Judge, and FARRELL and FISHER, Associate Judges.

FISHER, Associate Judge:

These cross-appeals require us to apply the D.C. Rental Housing Conversion and Sale Act, D.C.Code § 42–3404.02 et seq., colloquially known as the Sale Act. Under that legislation, before the owner may sell a housing accommodation, it must give the tenant (or tenants) notice and an opportunity to purchase the accommodation at a price and on terms which represent a *bona fide* offer of sale. D.C.Code § 42–3404.02. However, not every significant transfer of interests meets the statutory definition of a "sale." Applying our decision in *West End Tenants Ass'n v. George Washington Univ.*, 640 A.2d 718 (D.C.1994), we hold that the transaction at issue here did not constitute a sale. We also hold that the tenants in this case do not have an independent cause of action under the Consumer Protection Procedures Act, D.C.Code § 28–3901 et seq. ("the CPPA").[1]

## I. The Factual and Procedural Background

This dispute relates to two apartment buildings located within the District of Columbia: the Capitol Park Twin Towers, a 320–unit building located at 101/103 G Street, S.W., and the Capitol Park Plaza, a 328–unit building located at 201 I Street, S.W. Appellant Twin Towers Plaza Tenants Association, Inc. ("Tenants Association") sued appellees, Capitol Park Associates Limited Partnership and Capitol Park Apartments Limited Partnership (collectively "Owners"), alleging violations of both the Sale Act and the CPPA. This litigation was precipitated by an October 2002 transaction by which the Owners entered into a tenancy in common arrangement. In this "95/5 transaction," Capitol

---

1. The future impact of our decision likely is limited by recent amendments to the Sale Act. In May 2005, the Council of the District of Columbia passed D.C. Law 16–0015, the "Rental Housing Conversion and Sale Amendment Act of 2005," prompted at least in part by this litigation. Among other changes, the Council added D.C.Code § 42–3405.03b (b) to direct that the applicability of the Sale Act:

 shall be determined by examining the substance of the transaction or series of transactions. A step transaction or other device entered into or employed for the purpose of avoiding the obligation to comply with the requirements of this chapter shall be construed in accordance with the substance of the transaction.

This legislation became effective on July 23, 2005. Both parties submitted supplemental briefs in which they agreed that the recent legislation applies prospectively only, and thus does not impact this appeal.

Park Associates (the transferring owner) deeded a 95% interest in the two buildings to Capitol Park Apartments (the receiving owner). The Owners simultaneously entered into a tenancy in common agreement which allocated nearly complete management control over the two buildings to the 95% owner.

In March 2003, tenants at both buildings learned about the October 2002 transaction and some of them formed the Tenants Association for the purpose of attempting to block or unwind the 95/5 transaction. The Tenants Association filed a civil suit in the Superior Court in April 2003. Its complaint requested orders (1) rescinding the 95/5 transaction; (2) declaring that the transaction was null and void; and (3) requiring that the buildings be offered for sale to the Tenants Association and that the Owners negotiate in good faith. As this matter proceeded before the trial court, the Owners admitted, as they did in argument before us, that the 95/5 transaction was crafted to avoid the Sale Act's requirement that the individual tenants of a housing accommodation be given notice and an opportunity to purchase the buildings. *See* D.C.Code §§ 42–3404.02 and 42–3404.03. The Owners argued that this transaction was not covered by the Sale Act because it was not a "sale" as we previously have defined that term.

In *West End Tenants Ass'n* we interpreted the terms "sell" and "sale" as they are used in the Sale Act:

> There appears to be an almost *universal consensus* that, in the context of real property transactions, the word "sale" signifies an *absolute transfer* of property. BLACKS LAW DICTIONARY 1337 (6th ed. 1990) defines sale, inter alia, as
>
>> A contract whereby property is transferred from one person to another for a consideration of value, implying the passing of the *general and absolute*

> *title, as distinguished from a special interest falling short of complete ownership.*

640 A.2d at 727–28 (some emphasis added). Relying on this definition, the Owners argued that a 95% interest in the buildings fell "short of complete ownership" and that the transfer of that interest in connection with the tenancy in common agreement was not an "absolute transfer" of title. The transaction therefore was not a "sale" which triggered any obligation on their part to notify the tenants or to make them an offer. The Owners eventually moved for summary judgment on this ground. The trial court denied that motion, but ruled separately that the claims of the Tenants Association under the CPPA were precluded because the Sale Act provided exclusive remedies for violations of its disclosure provision. The trial court later granted the Owners' motion to dismiss the Tenants Association's suit for lack of standing.

The Tenants Association filed a notice of appeal from the trial court's dismissal of its case for lack of standing and from the trial court's grant of summary judgment to the Owners on the CPPA claim. The Owners then cross-appealed the trial court's ruling that the 95/5 transaction was a "sale" within the meaning of the Sale Act.

## II. The Issue of Standing

 The trial court held that appellant did not qualify as a "tenant organization" because it had failed to demonstrate that it represented the majority of individual tenants in the two buildings and had not registered with the Mayor. *See* D.C.Code § 42–3401.03(18) (defining "tenant organization") and § 42–3404.11 (establishing registration requirement). We cannot find this analysis of the facts to be clearly

erroneous.[2] The court also declined to allow appellant to amend its complaint to substitute individual tenants as plaintiffs, concluding that our decision in *West End Tenants Ass'n* precluded them from bringing suit under the Sale Act.

The conclusion that individual tenants have no standing may seem problematic in the circumstances of this case. The Sale Act specifically states that "[a]n aggrieved owner, *tenant*, or tenant organization may seek enforcement of any right or provision in this chapter through a civil action in law or equity ...." D.C.Code § 42–3405.03 (emphasis added).[3] However, this court has twice held that individual tenants were not "aggrieved" within the meaning of § 42–3405.03 and thus *did not* have standing to sue.[4] This apparent inconsistency might be explained by reference to other portions of the Act which allow individual tenants to negotiate to buy a single-family accommodation,[5] or one with two to four units,[6] but require the tenants to form a tenant organization in order to make a contract to purchase a building with five or more units.[7] (Of course, the buildings at the center of this litigation have more than five units.) On the other hand, the tenants are not at this point attempting to purchase the buildings. They are seeking to enforce their alleged rights as individuals to receive notice of the transaction and an offer of sale.

Recognizing the challenge presented by footnote 1 in *West End Tenants*, appellant urges us to treat that discussion as *dictum*. We cannot do so, however, because it provided the analytical basis for dismissing the appeals of individual tenants. 640 A.2d at 721 n. 1. Nor can we, as a division, accept appellant's invitation to reconsider that holding. *See M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971) (only the en banc court may overrule the holding of a division of this court). Appellant asks us, therefore, to grant it "associational standing." *See Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1207–10 (D.C.2002).

We need not resolve this complicated standing issue. Rather, we rely on a body of cases which permits us to assume for the sake of argument that a party has standing if the issue clearly must be resolved against that same party on alter-

---

**2.** Indeed, in its motion to alter or amend judgment, the Tenants Association acknowledged that it had not yet obtained signed membership forms from a majority of the eligible tenants.

**3.** In granting the motion to dismiss, the trial court explained that the text of D.C.Code § 42–3405.03 "appears to support a cause of action by an individual tenant" and stated that it found "persuasive" the reasoning of *Redmond v. Birkel*, 797 F.Supp. 36 (D.D.C. 1992), where the court had held that several individual tenants did have standing to bring a cause of action against the owner of the accommodation. However, the trial court felt constrained by this court's conclusion in footnote 1 of *West End Tenants Ass'n*. In that footnote, we explained:

[I]f the conduct of an owner gives rise to any basis for a civil action against the own-

er under § [42–3405.03], *it is only the tenant organization that is 'aggrieved'* as that term is used in § [42–3405.03] and, therefore, *it is only the tenant organization that can bring a civil action against the owner* under the statute.

640 A.2d at 721 n. 1 (emphasis added; quotation marks and citation omitted).

**4.** In addition to *West End Tenants, see Stanton v. Gerstenfeld*, 582 A.2d 242, 245 (D.C.1990) (holding that when an accommodation contains five or more units, it is only the tenant organization that is "aggrieved" and can bring a civil action against the owner).

**5.** D.C.Code § 42–3404.09.

**6.** D.C.Code § 42–3404.10.

**7.** D.C.Code § 42–3404.11.

nate grounds.[8] This course is especially proper in these circumstances, where appellant directly links the viability of its CPPA claim to the merits of its Sale Act claim. In other words, as we explain below, we have to determine whether there was a violation of the Sale Act in order to resolve appellant's claim under the CPPA. (And there is no issue of standing there. The Tenants Association and individual tenants alike fit within the statutory definition of a "person" entitled to bring a civil action under the CPPA. *See* D.C.Code §§ 28–3901(1) and 28–3905(k)(1)). We therefore proceed to the question of whether this 95/5 transaction was a sale.

### III. Was This Transaction A Sale?

■ The relevant portion of the Sale Act,[9] D.C.Code § 42–3404.02, entitled "Tenant opportunity to purchase; 'sale' defined," states:

(a) Before an owner of a housing accommodation may sell the accommodation, or issue a notice of intent to recover possession, or notice to vacate, for purposes of demolition or discontinuance of housing use, the owner shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale.

Despite the caption of this section, subsection (a) does not define the word "sale," so in *West End Tenants* we were required to discern its plain meaning. We have already quoted our holding at page 1116, above.

The statute does contain additional provisions defining "sell" or "sale," but these specialized definitions do not apply to the circumstances presented here. As we explained in *West End Tenants Ass'n,* subsection (b)[10] was enacted as "The Tenant Opportunity to Purchase Clarification

---

**8.** *See Boy Scouts of Am. v. District of Columbia Comm'n on Human Rights,* 809 A.2d 1192, 1196–97 n. 4 (D.C.2002) (assuming, without deciding, that "tester" had standing to challenge the Boy Scouts' rejection of his membership application); *Smalls v. State Farm Mut. Auto. Ins. Co.,* 678 A.2d 32, 35 n. 3 (D.C.1995) (assuming, without deciding, that plaintiff had standing to bring action and accordingly addressing the merits of claim). *See also Hawkins v. W.R. Berkley Corp.,* 889 A.2d 290, 293–94 & n. 9 (D.C.2005); *Childs v. United States,* 760 A.2d 614, 617 & n. 4 (D.C. 2000).

**9.** The 1995 version of the Sale Act, the "Rental Housing Conversion and Sale Act of 1980 Reenactment and Amendment Act of 1995," was in effect at the time of the transaction in this case.

**10.** Subsection (b) provides:
For the purposes of this subchapter, the terms "sell" or "sale" include the execution of any agreement that assigns, leases, or encumbers property, pursuant to which the owner:
(1) Relinquishes possession of the property;

(2) Extends an option to purchase the property for a sum certain at the end of the assignment, lease, or encumbrance and provides that a portion of the payments received pursuant to the agreement is to be applied to the purchase price;
(3) Assigns all rights and interests in all contracts that relate to the property;
(4) Requires that the costs of all taxes and other government charges assessed and levied against the property during the term of the agreement are to be paid by the lessee either directly or through a surcharge paid to the owner;
(5) Extends an option to purchase an ownership interest in the property, which may be exercised at any time after execution of the agreement but shall be exercised before the expiration of the agreement; and
(6) Requires the assignee or lessee to maintain personal injury and property damage liability insurance on the property that names the owner as the additional insured.

Amendment Act of 1989," and its aim was to retroactively bring the "Master Lease" agreement at issue in that case within the definition of "sale." 640 A.2d at 735–36. The text of subsection (b) covers only assignments, leases, and encumbrances of property that meet each of the six statutory requirements. The 95/5 transaction is not a "sale" within this definition because it does not meet all six requirements of the subsection.

Similarly, subsection (c) [11] is inapplicable to the 95/5 transaction because on its face it applies to a "transfer of 100% of all *partnership interests in a partnership* which owns the accommodation as its sole asset to 1 transferee *or of 100% of all stock* of a corporation which owns the accommodation as its sole asset ...." D.C.Code § 42–3404.02(c) (emphasis added). This case does not involve the sale of a partnership or a corporation.

The Tenants Association argues nevertheless that these provisions demonstrate that the definition in *West End Tenants* is not all-encompassing. Furthermore, it submits that subsection (b) demonstrates that a transfer of absolute title is not always required; similarly, subsection (c) shows that the legislature knew how to require a 100% transfer when it wanted to. We cannot agree with the Tenants Association that these specialized definitions al-ter the general meaning of "sale" in subsection (a). Indeed, they were added to the statute because the transactions they describe would not be captured by subsection (a).

■ To be a "sale" as the term is used in subsection (a), a property transaction must be an "absolute transfer" or amount to the passing of "general and absolute title." *West End Tenants,* 640 A.2d at 727–28. We emphasized this point in *West End Tenants* by distinguishing the passage of general and absolute title from transfers of interests "falling short of complete ownership." *Id.* at 728. Applying this definition to this case, it seems obvious that transferring 95% of title is not the same as transferring "absolute title." Such a transaction is, by definition, a transfer of a special interest "falling short of complete ownership," and therefore not a "sale" within the meaning of § 42–3404.02(a) as interpreted in *West End Tenants Ass'n.* As it was with the "Master Lease" in question there, the transferring owner here "ha[s] not conveyed [its] entire interest and title" in the buildings, and the 95/5 transaction therefore does not effect an "absolute transfer." 640 A.2d at 728. We find nothing ambiguous about the language chosen in *West End Tenants Ass'n* that could be read to dictate a different conclusion here.[12]

---

11. Subsection (c) provides in pertinent part:

> For the purposes of this subchapter, the term "sell" or "sale" includes the transfer of 100% of all partnership interests in a partnership which owns the accommodation as its sole asset to 1 transferee or of 100% of all stock of a corporation which owns the accommodation as its sole asset to 1 transferee in 1 or more transactions occurring during a period of 1 year from the date of the first such transfer, and a master lease which meets some, but not all of the factors described in subsection (b) of this section or which is similar in effect ....

12. The Sale Act contains its own rule of statutory construction, which states:

> The purposes of this chapter favor resolution of ambiguity by the hearing officer or a court toward the end of strengthening the legal rights of tenants or tenant organizations to the maximum extent permissible under law. If this chapter conflicts with another provision of law of general applicability, the provisions of this chapter control.

D.C.Code § 42–3405.11. In *West End Tenants Ass'n* we concluded that this provision did not apply because there was no ambiguity in the meaning of the word "sale." *See* 640 A.2d at 727 n. 16.

■ The Council has had several opportunities to alter this definition in the years since we issued our decision in *West End Tenants Ass'n*, but it had not done so at the time of the transaction at issue in this case. *But see* note 1 *supra*. The Tenants Association accurately points out that some of the Sale Act's legislative history urged that the term "sale" be construed to cover "all changes in fundamental control of ownership." *See Columbia Plaza Tenants' Ass'n v. Columbia Plaza Ltd. P'ship*, 869 A.2d 329, 334 (D.C.2005).[13] However, no such language was added to the Sale Act, so the Council did not purport to overrule our interpretation of § 42–3404.02(a).[14] Indeed, the discussion cited by appellant related to the amendment that became subsection (c). We have already explained why that provision is not helpful in resolving this case. We therefore conclude that *West End Tenants Ass'n* controls, and that the 95/5 transaction was not a "sale" covered by the Sale Act.

## IV. The CPPA Claim

■ The Tenants Association is also precluded from seeking relief under the CPPA. Although the CPPA is, "to say the least, an ambitious piece of legislation, with broad remedial purposes," *DeBerry v. First Gov't Mortgage & Investors Corp.*, 743 A.2d 699, 700 (D.C.1999) (internal citation and quotations omitted), it is not clear from its plain language that the statutory scheme, designed to protect consumers, applies to the situation presented here. On the one hand, the definition of "goods and services" does extend to real estate transactions. D.C.Code § 28–3901(a)(7). On the other hand, the CPPA expressly forbids the Department of Consumer and Regulatory Affairs ("the principal consumer protection agency of the District of Columbia government," *see* D.C.Code § 28–3902(a)) to apply the CPPA's administrative remedies to landlord-tenant relations. *See* D.C.Code § 28–3903(c)(2)(A). In *Childs v. Purll*, 882 A.2d 227 (D.C. 2005), we recognized that § 28–3905(k)(1) "no longer explicitly links the scope of private civil actions to the jurisdiction of the [DCRA]." *Id.* at 238. However, we did not need to decide "whether the Council intended ... to expand the private right of action" to cover landlord-tenant relations. *Id.*

In this case we likewise find it unnecessary to determine whether a private civil action under the CPPA may ever extend to landlord-tenant relations. Here the Tenants Association explicitly bases its CPPA claim on the alleged violation of the Sale Act. Its complaint characterizes the alleged violations of the Sale Act as "unlawful trade practices" prohibited by the CPPA. In its briefs the Tenants Association variously states that "violation of the Sale Act also gives rise to remedies under the Consumer Protection Procedures Act" and that "violations of the Sale Act's disclosure obligations are unlawful trade

**13.** Citing COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, COMMITTEE REPORT ON BILL 11–53, THE "RENTAL HOUSING CONVERSION AND SALE ACT OF 1980 REENACTMENT AND AMENDMENT ACT OF 1995," March 14, 1995, p. 10.

**14.** The portion of the 1995 Committee Report cited by appellant and quoted in *Columbia Plaza* is properly understood as a characterization of a discussion which had occurred during a hearing in 1989. We do well to remember "the 'oft-repeated warning' that 'the views of a subsequent [legislature] form a hazardous basis for inferring the intent of an earlier one.'" *Milwaukee v. Illinois*, 451 U.S. 304, 332 n. 24, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–118, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)).

practices actionable under the CPPA." It also identifies the "unfair trade practices" as "the failure to make the disclosures and offers of sale required by the Sale Act." Because we have already held that the Sale Act does not apply to this transaction, appellant's CPPA claim cannot survive.[15]

Accordingly, we reverse the trial court's ruling that the 95/5 transaction constituted a sale and affirm, on other grounds, its grant of summary judgment to the defendants on the Tenants Association's claim under the CPPA. The judgment in favor of the defendants is

*Affirmed.*

---

**15.** The trial court reached the same result by following a different path. It held that applying the CPPA would conflict with the Sale Act because the CPPA allows recovery of damages and the Sale Act does not. It then applied D.C.Code § 42–3405.11, which provides that "[i]f this chapter [the Sale Act] conflicts with another provision of law of general applicability, the provisions of this chapter control." Because we conclude that the 95/5 transaction was not a "sale," we need not decide whether an aggrieved party would be able to recover damages for a violation of the Sale Act.