Maria GOMEZ, et al., Appellants,

v.

**INDEPENDENCE MANAGEMENT OF DELAWARE, INC., Appellee,**

and

**The 933 L Street Tenants' Association, Appellant,**

v.

Independence Management Company, Inc., et al., Appellees.

Nos. 05–CV–1487 to 05–CV–1499, 05–CV–1536 to 05–CV–1539, 06–CV–1150 and 06–CV–1387.

District of Columbia Court of Appeals.

Argued May 7, 2007.

Decided March 26, 2009.

---

Jonathan K. Tycko, for appellants. Kathleen R. Hartnett and Steven A. Skalet, were with him on the brief for Maria Gomez, et al., and Steven A. Skalet, Sandi Farrell, and Hassan A. Zavareei, Washington, DC, were with him on the brief for The 933 L Street Tenants' Association.

Richard W. Luchs, with whom Gregory T. DuMont, Washington, DC, was on the briefs, for appellees.

Barbara McDowell and Julie H. Becker, Legal Aid Society of the District of Columbia, Patricia Mullahy Fugere, Antonia K. Fasanelli, and Amber W. Harding, Washington Legal Clinic for the Homeless, Vytas V. Vergeer and Rebecca Lindhurst, Bread for the City, and David Reiser filed a brief, Washington, DC, amici curiae, supporting appellants Maria Gomez, et al.

Before KRAMER and FISHER, Associate Judges, and BELSON, Senior Judge.

FISHER, Associate Judge:

These consolidated appeals relate to the Eldon, a 57-unit apartment building located at 933 L Street, N.W., in the District of Columbia. Residents of this building formed a tenants' association which sued Independent Management Company ("IMC") for selling the Eldon without first offering the property to them as allegedly required by the Rental Housing Conversion and Sale Act, D.C.Code §§ 42–3404.02

through 42–3404.13 (2001) ("Sale Act"). The Association also alleged a violation of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C.Code §§ 28–3901 through 28–3911 (2001). The Superior Court entered summary judgment in favor of IMC, holding that the transfer of the Eldon was not a "sale" within the meaning of the statute, and that there had been no violation of the CPPA. The Tenants' Association appealed (Nos. 06–CV–1150 and 06–CV–1387). We reverse the grant of summary judgment in part and remand for further proceedings.

While the Sale Act lawsuit was pending, many of the tenants left the building. In separate litigation, the new owner of the Eldon, Independent Management of Delaware ("IMDel"), sued the remaining tenants for possession, claiming that it could not safely renovate the building while they lived there. These tenants defended on the grounds that IMDel's actions were retaliatory and that IMDel had not followed proper procedures in issuing notices to vacate. The Superior Court granted summary judgment to plaintiff IMDel, concluding that the tenants had not identified a genuine issue of material fact, and the individual tenants appealed (Nos. 05–CV–1487 through 05–CV–1499 and 05–CV–1536 through 05–CV–1539). We vacate the judgments granting possession to IMDel and remand for further proceedings.

## I. The Factual Background

### A. The Transaction(s) at Issue

The essential facts, viewed in the light most favorable to the tenants, are as follows: In March of 1999 George Hesse sold the Eldon to Independent Management Company, Inc. ("IMC"), which was owned entirely by Yafet Alem.[1] Because the El-

---

1. The Tenants' Association sued Hesse, alleging that he had violated the Sale Act by failing to give the tenants notice of the 1999 sale.

These claims were settled prior to trial and are not part of these appeals.

don was "big time losing money," Alem soon decided to sell the property, and he listed it with a real estate broker in 2002. Alem eventually decided to sell the property to HL Investments, a company owned and controlled by Hong Ly Thai.

Alem and Thai initially structured their agreement so that IMC would transfer a "95% interest as Tenants in Common" at closing; then, 366 days later, IMC was to transfer "its remaining Five (5%) interest to [HL Investments] for consideration of [one dollar]." In return, Thai was to pay the "total purchase price," $3,875,000, at closing. Alem testified that the purpose behind this structure was to avoid the requirements of the Sale Act. This deal never went to closing, however, because Thai had difficulty obtaining title insurance as a result of various liens on the property.

In June of 2003, Alem again attempted to sell the Eldon to Thai in a manner that would avoid the requirements of the Sale Act. This time Alem and Thai decided to structure the transaction as a "stock purchase." Because IMC owned other properties, Alem decided to create a wholly owned subsidiary, to which IMC would transfer ownership of the Eldon. The stock of that subsidiary would then be sold to Thai.

On June 24, 2003, Alem created Independence Management of Delaware, Inc. ("IMDel"), a wholly-owned subsidiary of IMC. The next day, on June 25, Alem appointed himself president of IMDel; he then resigned and appointed Thai as sole director and sole officer. That same day, IMC, acting through Alem, its president, entered into an Agreement of Sale of Shares of Stock of Independence Management of Delaware, Inc. ("Stock Sale Agreement"), with L Street Building, LLC, a company owned by Thai. In the contract, IMC agreed to sell 99% of IMDel's stock to L Street Building for $3,875,000—the price originally negotiated for the sale of the Eldon. Alem testified that he contracted to sell 99% of IMDel, rather than 100%, because he believed it would allow him to avoid the requirements of the Sale Act.

The Stock Sale Agreement specified that "on the Closing Date, record title to the [Eldon] will be in IMD[el]...." At the time the agreement was signed, on June 25, title to the Eldon was still in IMC. However, on June 26, Alem, acting as president of IMC, signed a deed transferring title to IMDel, as contemplated by the Stock Sale Agreement.[2] Six days later, on July 2, Thai and Alem closed on the Stock Sale Agreement. On July 3, a copy of the deed (the version dated June 21, 2003 (see footnote 2)) was recorded. As a result of the stock sale, Thai (through L Street Building, LLC) owned 99% of the stock in IMDel, which in turn owned the Eldon in fee simple. After the tenants learned about the transfer of the property to IMDel and Thai, the Tenants' Association filed the Sale Act case in February 2004 to assert the rights of its members to notice and an opportunity to purchase.

## B. The Tenants Are Told to Vacate the Building

While the transfer of the Eldon was being arranged, the tenants were attempting to improve the deteriorating conditions in the building. They formed, and became active members of, the Tenants' Association in 2001. They contacted inspectors regarding the condition of the building,

---

2. In addition to the deed dated June 26, the record contains another version of the same deed, dated June 21. The deeds are identical except for the date, and the parties dispute which version was used to transfer the property. It appears that IMDel did not yet exist on June 21, however.

and withheld rent, which they paid into the court's registry. IMC, which still owned the building at that time, sued for possession in landlord-tenant court, and the tenants counterclaimed, seeking to compel IMC to make improvements. A settlement agreement reached on April 24, 2003, obligated IMC to make repairs. IMC never made these repairs.

On August 11, 2003, after it acquired the building, IMDel asked the Rent Administrator for authority to issue 120-day notices to vacate to the remaining tenants, pursuant to Section 501(f) of the Rental Housing Act. D.C.Code § 42–3505.01(f) (2001). In its letter to the Rent Administrator, IMDel stated that it "plans to undertake extensive improvements with respect to the Property which cannot be safely performed with tenants in occupancy." A housing provider seeking to recover possession under section 501(f) must submit to the Rent Administrator "plans for the alterations or renovations ... [that] demonstrate that the proposed alterations or renovations cannot safely or reasonably be accomplished while the unit is occupied." D.C.Code § 42–3505.01(f)(1) (2001). IMDel submitted a one-page document from an architect listing the work to be undertaken, and two drawings of floor plans for the building. On September 4, 2003, the Rent Administrator approved the issuance of 120-day notices. The tenants did not know about IMDel's request, and therefore did not oppose it.

In September 2003, IMDel attempted to serve the notices to vacate on the tenants. When they refused to vacate, IMDel brought suits for possession in January 2004. The first of these cases was dismissed due to defects in service and in the notices themselves, and IMDel then voluntarily dismissed the remaining cases. In July 2004, IMDel issued a new round of 120-day notices. The tenants again refused to vacate, and IMDel brought individual suits for possession in November 2004. The court granted summary judgment to IMDel, authorizing eviction of the tenants, who have appealed.

## II. Standard of Review

■■■ "This court reviews a summary judgment decision de novo, construing the facts independently in the light most favorable to the nonmoving party." *Ivey v. District of Columbia*, 949 A.2d 607, 611 (D.C.2008). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Super. Ct. Civ. R. 56.; *Colbert v. Georgetown University*, 641 A.2d 469, 472 (D.C.1994) (en banc). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Linen v. Lanford*, 945 A.2d 1173, 1179 (D.C.2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III. Was the Eldon Sold?

The determinative issue in the first case is whether the transfer of the property from IMC to IMDel was a "sale" covered by the Sale Act. The Tenants' Association relies on subsections (a) and (c) of that Act to support its argument that it was.[3]

---

**3.** D.C.Code § 42–3405.03b (b) (2008 Supp.), which directs the court to "examin[e] the substance of the transaction" and to consider whether it was a "step transaction ... employed for the purpose of avoiding the obligation to comply with the requirements of this chapter," was enacted after the transaction at issue took place. The Tenants' Association acknowledges that the amendment has only prospective force, so it does not apply here.

## A. The General Definition of a Sale

Subsection (a) provides in relevant part that "[b]efore an owner of a housing accommodation may sell the accommodation, [he or she] shall give the tenant an opportunity to purchase the accommodation at a price and terms which represent a bona fide offer of sale." D.C.Code § 42–3404.02(a) (2001). This subsection does not explain the meaning of "sell" or "sale," but in *West End Tenants v. George Washington University,* 640 A.2d 718 (D.C. 1994), we defined a sale as "a contract whereby property is transferred from one person to another for a consideration of value, implying the passage of the general and absolute title, as distinguished from a special interest falling short of complete ownership." *Id.* at 727 (quoting Black's Law Dictionary 1337 (6th ed. 1990)). We applied this definition in *Twin Towers Plaza Tenants Ass'n v. Capitol Park Assocs., L.P.,* 894 A.2d 1113 (D.C.2006), holding that transfer of a 95% interest in a property was not a sale because "[s]uch a transaction is, by definition, a transfer of a special interest 'falling short of complete ownership,' and therefore not a 'sale' within the meaning of the [Sale Act]." *Id.* at 1119. The two defining characteristics of a sale under subsection (a) are (1) the passing of general and absolute title (2) in exchange for consideration.

## B. The Transfer Was Not a Sale Under Subsection (c)

While the case law interpreting § 42–3404.02(a) provides a general definition of "sale," other subsections of the Sale Act provide "specialized definitions ... added to the statute because the transactions they describe would not be captured by subsection (a)." *Twin Towers,* 894 A.2d at 1118–19. At the time of this transaction, subsection (c) stated, in relevant part, that "the term 'sell' or 'sale' includes the transfer ... of 100% of all stock of a corporation which owns the accommodation as its sole asset to 1 transferee in 1 or more transactions occurring during a period of 1 year from the date of the first such transfer...." D.C.Code § 42–3404.02(c) (2001).[4] Appellant (the Tenants' Association) argues that, because the statute uses the word "includes," it is not limited to transfers of 100% of the stock, and it asserts that the Council intended the test to be "whether the transaction involved a transfer of 'fundamental control of ownership.'"

▮▮▮▮ "[T]he starting point for interpreting a statute is the language of the statute itself," and "[a]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *West End Tenants,* 640 A.2d at 726 (quoting *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). The language of subsection (c) unambiguously requires a transfer of 100% of a corporation's stock within one year; the use of the word "includes" does not create ambiguity. Read in context, subsection (c) simply means that the transactions described there shall be included within the definition of a "sale" even though they do not meet the test established in our case law construing subsection (a). Moreover, we are not per-

---

**4.** The corresponding portion of the current statute, amended in 2005, provides: "For the purposes of subchapters IV and V of this chapter, the term 'sell' or 'sale' shall include ... [t]he transfer of an ownership interest in a corporation, partnership, limited liability company, association, trust, or other entity which owns an accommodation as its sole or principal asset, which, in effect, results in the transfer of the accommodation pursuant to subsection (a) of this section." D.C.Code § 42–3404.02(c)(1)(B)(I) (2008 Supp.). The amended statute sets forth several exceptions to this general rule.

suaded by the tenants' association's references to legislative history. Indeed, we rejected essentially this same argument in *Twin Towers*. 894 A.2d at 1120. Therefore, the sale of 99% of IMDel's stock does not meet the requirements of subsection (c).

### C. The Transfer May Have Been a Sale Under Subsection (a)

■ The Tenants' Association argues in the alternative that, when viewed in context, the transfer of the Eldon from IMC to IMDel was a sale under § 42–3404.02(a)—that there was a passing of general and absolute title in exchange for consideration. The Association points out that the Stock Sale Agreement implicitly required IMC to deliver the deed transferring "the Grantor's entire interest in the real property" to IMDel, and further obligated L Street Building, LLC (controlled by Thai) to pay $3,875,000 to IMC. It emphasizes that Alem and Thai signed the Stock Purchase Agreement *before* IMC delivered the deed to IMDel, and that "IMC's right to receive the $3,875,000 payment from Thai's company [L Street Building, LLC] was *contingent upon this transfer of fee simple title.*"[5] Appellant also asserts that Alem had appointed Thai the sole officer and sole director of IMDel *before* title to the Eldon was transferred to IMDel, thereby putting IMDel in Thai's control at the time the deed was received. Appellant argues that these circumstances, taken together with Alem's admission that

the reason he structured the deal in this way was to avoid the requirements of the Sale Act, create genuine issues of material fact as to whether the transaction carried out in compliance with the Stock Sale Agreement of June 25, 2003, met the definition of the term "sale" established in *West End Tenants* and *Twin Towers*.

■ The argument of the Tenants' Association will have particular force if, as it claims, the deed transferring the property to IMDel was delivered after the Stock Sale Agreement was signed and after IMDel was already in the exclusive control of Thai (who was the sole officer, sole director, and 99% owner of that company).[6] This sequence of events is contested by IMC, which claims that the property was transferred to IMDel on June 21, before the Stock Sale Agreement was signed. The record contains two versions of the deed, identical except for the date. The date of the authentic deed and the date of its delivery are contested material facts which may prove determinative in deciding whether the transfer of the Eldon to IMDel was a mere reorganization of corporate assets, or a thinly disguised sale to a third party. There is no doubt that general and absolute title was transferred from IMC to IMDel, and there is at least a respectable argument that this occurred in return for consideration of value which flowed from L Street Building to IMC. Therefore, this transaction may well have been a sale under subsection (a).

---

**5.** Not coincidentally, perhaps, the price that Thai was to pay for 99% of IMDel's stock was the same price she had originally negotiated to pay for the Eldon in the parties' first attempt to structure a transaction.

**6.** In determining when the transfer of a property took place, we look at the date the deed was *delivered,* not the date it is recorded. *See Owens v. Liff,* 65 A.2d 921, 923 (D.C.1949) ("Under District of Columbia law a deed conveying real property takes effect from the date of the delivery thereof, except that as to creditors and subsequent bona fide purchasers and mortgagees without notice of the deed and others interested in said property the deed takes effect from the time of its delivery to the recorder of deeds for record." (citing the statute now codified at D.C.Code § 42–401 (2001))).

## D. Appellees Misplace Their Reliance Upon *Wallasey Tenants*

To forestall this conclusion, appellees rely upon our decision in *Wallasey Tenants Ass'n,* where we carved out an exception for some transactions which appear to meet the subsection (a) definition of a sale but nevertheless (we held) do not trigger the tenants' opportunity to purchase a building. In that case, Mr. Fairbairn had transferred an apartment building from himself to entities wholly owned by him. *Wallasey Tenants Ass'n v. Varner,* 892 A.2d 1135 (D.C.2006). Although "the conveyance took the appearance of a sale," *id.* at 1141, we held that it did not trigger a right of the tenants to purchase the property. "The conveyance directed by Mr. Fairbairn to a *de facto* wholly owned corporation was effectuated for no purpose other than to legitimately limit Mr. Fairbairn's liability and to simplify his future estate planning." *Id.* at 1141 (footnote omitted). There had been no arms' length bargaining between the grantor and the grantee. *Id.* "Finally, and most significantly, Mr. Fairbairn remained in ultimate control of the Wallasey at all times. . . . [T]his conveyance was a restructuring not a sale." *Id.* In other words, the right of first refusal under the Sale Act "is simply not available when closely related parties who do not engage in arms' length dealings convey property for the purposes of estate planning, tax restructuring, limiting liability, or general property management." *Id.* at 1141 n. 3.

Appellees' arrangement is not comparable to that discussed in *Wallasey,* and, consequently, they cannot benefit from the exception we created in that case. Unlike *Wallasey,* the transfer here clearly was not conducted "for the purposes of estate plan-

ning, tax restructuring, limiting liability, or general property management." Alem admitted that "the major reason" for structuring the transaction as a stock sale was to avoid having to make an offer of sale to the tenants. Thai also understood the stock purchase to be necessary because "the seller did not want to go through [the] tenant[s]." There was arms' length bargaining over the price and the structure of the deal. Moreover, IMC did not retain control of the property. Control was transferred to Thai, and ownership followed shortly thereafter. Finally, the entire transaction was contemplated by, and carried out in accordance with, the Stock Sale Agreement, which spelled out the obligations of the parties. Our holding in *Wallasey* does not assist appellees.

We emphasize that we have viewed the evidence in the light most favorable to the tenants' association. Further inquiry may clarify what happened. At this point, however, the date of the authentic deed and the date of its delivery are material facts in genuine dispute.[7] Furthermore, there is a genuine issue whether the $3,875,000 that Thai's company paid under the Stock Sale Agreement was in fact consideration for the transfer of "general and absolute" title. We therefore reverse the grant of summary judgment and remand the case to the trial court for further proceedings. In doing so, we do not preclude consideration of other contentions not specifically rejected here.

## IV. The Consumer Protection Procedures Act Claim

The Tenants' Association also alleged that IMC and IMDel had violated the CPPA. However, it did not base that claim on any separate acts or omissions of the

---

7. We render no opinion at this point on whether findings that the authentic deed was dated June 21 and that it was delivered on or about that date would be fatal to the claim of the tenants' association.

defendants that might constitute unfair trade practices. Rather, the Association explicitly linked its CPPA claim to the asserted violation of the Sale Act.[8] We agree with the trial court that the defendants were entitled to judgment on this claim.

■ As we observed in *Twin Towers,* "it is not clear from its plain language that the statutory scheme [the CPPA], designed to protect consumers, applies to the situation presented here." 894 A.2d at 1120. We did not need to resolve the question at that time, however. The tenants' association in *Twin Towers* "explicitly base[d] its CPPA claim on the alleged violation of the Sale Act" and, "[b]ecause we [had] already held that the Sale Act [did] not apply to [that] transaction, [the] CPPA claim [could] not survive." *Id.* at 1120–21. The two claims are directly linked in this case, too, but we have decided that further proceedings are required to determine whether the Sale Act was violated. Rather than remand the CPPA claim as well, and perhaps require a needless expenditure of resources by the litigants and the trial court, we proceed to consider whether that Act applies; we conclude that it does not.

We find no evidence in the plain language of the CPPA that the legislature intended it to apply in these circumstances. Allegations that the defendants failed to comply with the Sale Act do not fit naturally within the thirty-some detailed examples of unfair trade practices set forth in D.C.Code § 28–3904 (2001). Tellingly, some portions of § 3904 make it a violation of the CPPA for any person to "violate any provision" of several other statutes, but these subsections conspicuously fail to mention the Sale Act at all.[9] Moreover, there is no compelling reason to shoehorn the allegations made here into the ill-fitting language of the CPPA because the Sale Act is comprehensive legislation which not only creates the right at issue here but also establishes detailed requirements for compliance. Most importantly, the Sale Act also contains its own detailed provisions for implementation and enforcement. *See* D.C.Code §§ 42–3405.01 to 42–3405.13 (2001 & 2008 Supp.). "Resisting the force of the better-fitted statute requires a good countervailing reason, and none appears here." *EC Term of Years Trust v. United States,* 550 U.S. 429, 434, 127 S.Ct. 1763, 1767, 167 L.Ed.2d 729 (2007).

8. The crucial allegations on which this claim is based are found in paragraphs 37 and 38 of the complaint:

> 37. The provision to a tenant of information and rights required to be provided by the Rental Housing Act is a "trade practice" within the meaning of the Consumer Protection Act.
> 38. By failing to make an offer of sale to the tenants of the Property, by failing to enter into good faith negotiations with those tenants for a reasonable period of time, by failing to provide the tenants with the contract of sale or to otherwise inform the tenants of the terms of that contract, and by failing to afford the tenants the right of first refusal, defendants Hesse, Independence, and IMDel engaged in unlawful

trade practices within the meaning of the Consumer Protection Act.

9. Examples of these statutes include: D.C.Code §§ 28–2–312 through 28–2–318 (relating to express and implied warranties under the UCC) (§ 28–3904(x)); the District of Columbia Consumer LayAway Plan Act (§ 28–3904(y)); the Rental Housing Locator Consumer Protection Act of 1979 (§ 28–3904(z)); the provisions of sections 32–404, 32–405, 32–406, and 32–407 (relating to employment agencies) (§ 28–3904(aa)); and the Real Property Credit Line Deed of Trust Act of 1987 (§ 28–3904(cc)). The CPPA also incorporates by reference title 16 of the District of Columbia Municipal Regulations (relating to consumers and commercial practices) (§ 28–3904(dd)).

Indeed, the language and legislative history of the CPPA point to the opposite conclusion—that it was never intended to apply to this situation. The Act provides that "[t]he Department of Consumer and Regulatory Affairs [DCRA] shall be the principal consumer protection agency of the District of Columbia government and shall carry out the purposes of this chapter." D.C.Code § 28–3902(a) (2001). Yet, the Council has expressly forbidden the DCRA to apply the administrative remedies of the CPPA to landlord-tenant relations. D.C.Code § 28–3903(c) (2001).[10] *See Parker v. Martin,* 905 A.2d 756, 763–64 (D.C.2006); *Twin Towers,* 894 A.2d at 1120. Nevertheless, appellant argues that we should allow private parties to apply the CPPA to landlord-tenant relations. We reject this reasoning, which rests not upon statutory language or legislative history, but rather upon an attenuated inference mistakenly drawn from an amendment to the statute which took effect in the year 2000.

Prior to that time, § 28–3905(k)(1) provided in part:

> Any consumer who suffers any damage as a result of the use or employment by any person of a trade practice in violation of a law of the District of Columbia *within the jurisdiction of the Department* [of Consumer and Regulatory Affairs] may bring an action in the Superior Court of the District of Columbia to recover or obtain any of the following [remedies]. . . .

(Emphasis added.) "We have construed the italicized language to mean that where the Act limits the jurisdiction of the [DCRA], 'the scope of the cause of action created by § 28–3905(k)(1) is similarly limited.'" *Childs v. Purll,* 882 A.2d 227, 238 (D.C.2005) (quoting *Diamond v. Davis,* 680 A.2d 364, 365–66 n. 2 (D.C.1996)). However, "[t]he Council of the District of Columbia amended § 28–3905(k)(1) in October 2000 . . . so that the subsection no longer explicitly links the scope of private civil actions [under the CPPA] to the jurisdiction of the [DCRA]. . . ." *Childs,* 882 A.2d at 238.[11] We did not need to decide in *Childs* "whether the Council intended thereby to expand the private right of action. . . ." *Id.* We now hold that the Council did not intend by that amendment to extend the private right of action created by the CPPA into the realm of landlord-tenant relations.[12]

---

**10.** D.C.Code § 28–3903(c) provides in part:

> (c) The Department may not:
>
> . . .
>
> (2) apply the provisions of section 28–3905 to:
>
> (A) landlord-tenant relations;
>
> (B) persons subject to regulation by the Public Service Commission of the District of Columbia;
>
> (C) professional services of clergymen, lawyers, and Christian Science practitioners engaging in their respective professional endeavors;
>
> (D) a television or radio broadcasting station or publisher or printer of a newspaper, magazine, or other form of printed advertising, which broadcasts, publishes, or prints an advertisement which violates District law, except insofar as such station, publisher or printer engages in a trade practice which violates District law in selling or offering for sale its own goods or services, or has knowledge of the advertising being in violation of District law; or
>
> (E) an action of an agency of government.

**11.** The corresponding language of § 3905(k)(1) now reads:

> A person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia and may recover or obtain the following remedies. . . .

D.C.Code § 28–3905(k)(1) (2001 & Supp. 2008).

There is a much more convincing explanation for the deletion of this language in October 2000. In 1995 the Council suspended DCRA enforcement of the CPPA for budgetary reasons.[13] An October 2000 amendment to D.C.Code § 28–3902(I) extended that suspension until October 1, 2002. This was a fiscal measure designed to "avoid[ ] a substantial negative fiscal impact (estimated to be approximately $546,000) that would occur if the Department of Consumer and Regulatory Affairs were required to renew this program which was first suspended in FY 1996." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE OF THE WHOLE, REPORT ON BILL 13–679, "FISCAL YEAR 2001 BUDGET SUPPORT ACT OF 2000," at 26 (May 19, 2000). At the same time, the Council authorized, but did "not require the Office of the Corporation Counsel to pursue consumer protection claims more aggressively, provide[d] additional remedies and potential recovery on behalf of citizens and the District government, and establishe[d] a District of Columbia Consumer Protection Fund into which increased fines and other monetary remedies would be deposited and dedicated for the purposes of consumer protection." Id. See D.C.Code §§ 28–3902(I), –3905(k), –3909, –3910, –3911 (2001). The contemporaneous amendment to § 3905(k)(1) authorized representative actions and expanded the available remedies to include minimum damages of $1,500 per violation, injunctive relief, and restitution.

Because the DCRA was not enforcing the CPPA at that time, it made no sense when rewriting this section to preserve the language which linked the scope of the private action to the jurisdiction of the DCRA. More importantly, there is no indication whatsoever that the Council intended by deleting this language to expand the reach of the CPPA. Significantly, the Council did not repeal the express limitations on DCRA activities set forth in D.C.Code § 28–3903(c) (2001), and quoted in footnote 10, above.

The logic of appellant's position is that the Council, although silent on the matter,

---

12. The CPPA definition of "goods and services" was expanded in 1990 to include "real estate transactions," *DeBerry v. First Government Mortgage & Investors Corp.*, 743 A.2d 699, 702 (D.C.1999), and we have held that the CPPA applies to real estate mortgage finance transactions. *Id.* That amendment was intended, in part, to overrule our holding in *Owens v. Curtis*, 432 A.2d 737, 739 (D.C. 1981), that the CPPA did not apply to the sale of real estate. *See DeBerry*, 743 A.2d at 702 n. 8; *see also* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON CONSUMER AND REGULATORY AFFAIRS, REPORT ON BILL 8–111, THE "DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES AMENDMENT ACT OF 1989," AND BILL 8–271, "CONSUMER PROTECTION PROCEDURES ACT AMENDMENT ACT OF 1989," Attachment B at 5 (Oct. 23, 1990) ("With this amendment the [DCRA] will be able to utilize the Act to assist consumers who encounter unlawful trade practices connected with the purchase of real property.") The present case clearly centers on a transaction involving real estate, but the CPPA protects the rights of consumers, *see Ford v. ChartOne, Inc.*, 908 A.2d 72, 81 (D.C.2006), and the tenants' association is not a consumer in the transaction at issue here. Its rights, if any, arise from the landlord-tenant relationship.

13. *See* D.C.Code § 28–3902 (1996 Repl.); COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE OF THE WHOLE, REPORT ON BILL 11–218, "OMNIBUS BUDGET SUPPORT ACT OF 1995," at 19 (Apr. 18, 1995) (noting that an amendment to § 3902 "add[ed] a new section that would suspend enforcement of the act by the [DCRA] until October 1, 1998"); COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE OF THE WHOLE, REPORT ON BILL 12–618, "FISCAL YEAR 1999 BUDGET SUPPORT ACT OF 1998," at 8, 15 (May 5, 1998) (extending the suspension until October 1, 2000, and noting that "[e]nactment of this title is necessary to reflect the continued inability of DCRA to administer consumer protections in FY 1999 due to continued lack of funding for the program").

intended to extend the reach of the CPPA not only to landlord-tenant relations but also to persons regulated by the Public Service Commission, to professional services of clergymen, lawyers, and Christian Science practitioners, to television or radio broadcasting stations, and to the other entities listed in footnote 10, *supra*. Nothing in the plain language of the statute or its legislative history indicates that the legislature intended such a dramatic expansion of the Act, and the inference on which appellant relies is much too weak to support its argument. The Superior Court properly granted summary judgment to the defendants on this claim.

## V. Retaliatory Eviction

Apart from announcing its ruling, the court's order granting judgments of possession in favor of IMDel merely states that "[t]he Court is in agreement with the arguments advanced by plaintiff and discerns no genuine issue of material fact. Some of defendants' arguments are wholly unsupported by any record evidence." We conclude to the contrary that there are genuine issues of material fact about whether IMDel has "come[ ] forward with clear and convincing evidence to rebut [the statutory] presumption" of retaliatory action. *See* D.C.Code § 42–3505.02(b) (2001).

D.C.Code § 42–3505.02(a) (2001) provides in pertinent part that "[n]o housing provider shall take any retaliatory action against any tenant who exercises any right conferred upon the tenant by this chapter, by any rule or order issued pursuant to this chapter, or by any other provision of law. Retaliatory action may include any action or proceeding *not otherwise permitted by law* which seeks to recover possession of a rental unit...." (emphasis added). Moreover, the statute creates a presumption that "retaliatory action has been taken" if the tenant has engaged in one or more of six enumerated activities "within the 6 months preceding the housing provider's action...." D.C.Code § 42–3505.02(b) (2001). If the presumption has been triggered, the housing provider must come forward with clear and convincing evidence to rebut it. *Id.*[14]

14. D.C.Code § 42–3505.02(b) (2001) provides in full:

(b) In determining whether an action taken by a housing provider against a tenant is retaliatory action, the trier of fact shall presume retaliatory action has been taken, and shall enter judgment in the tenant's favor unless the housing provider comes forward with clear and convincing evidence to rebut this presumption, if within the 6 months preceding the housing provider's action, the tenant:

(1) Has made a witnessed oral or written request to the housing provider to make repairs which are necessary to bring the housing accommodation or the rental unit into compliance with the housing regulations;

(2) Contacted appropriated officials of the District government, either orally in the presence of a witness or in writing, concerning existing violations of the housing regulations in the rental unit the tenant occupies or pertaining to the housing accommodation in which the rental unit is located, or reported to the officials suspected violations which, if confirmed, would render the rental unit or housing accommodation in noncompliance with the housing regulations;

(3) Legally withheld all or part of the tenant's rent after having given a reasonable notice to the housing provider, either orally in the presence of a witness or in writing, of a violation of the housing regulations;

(4) Organized, been a member of, or been involved in any lawful activities pertaining to a tenant organization;

(5) Made an effort to secure or enforce any of the tenant's rights under the tenant's lease or contract with the housing provider; or

(6) Brought legal action against the housing provider.

Focusing upon the italicized portion of the language we have quoted from subsection (a), IMDel argues that the presumption of retaliatory action was not triggered in this case, and that, even if it was, IMDel succeeded in rebutting it by clear and convincing evidence. We disagree with both assertions.

▬ In their statement of material facts opposing IMDel's motion for summary judgment, the tenants made several assertions intended to trigger the statutory presumption. For example, they asserted (relying upon an affidavit and sworn deposition testimony) that they were members of the tenants' association "during the 6–month period prior to service of the 120–day notices at issue in these cases." IMDel does not appear to dispute this claim, which is sufficient, by itself, to trigger the presumption. *See* D.C.Code § 42–3505.02(b)(4), quoted in note 14, *supra.*

The tenants also asserted that they "have never paid rent to IMDel. During the time that IMDel has owned the building, the Tenants have been paying their rent into the Court's registry." *See id.,* § 42–3505.02(b)(3). IMDel protests that by the time it "took control of the building in June of 2003, the rent strike and the conditions of the building were obvious, outstanding and long-lived; it was the *status quo.*" It is true that when creating the presumption of retaliatory action, the legislature might logically have focused on when the supposed motive to retaliate first arose. However, the language of the statute does not speak of when the tenant *first* withheld rent or when she *became* a member of a tenant organization. Although the withholding of rent may have begun long

before IMDel entered the picture, it continued during the six-month period preceding service of the 120–day notices. It thus fits within the plain language of subsection (b)(3). The tenants may qualify on other grounds as well,[15] but subsection (b) is worded in the disjunctive, and they need only fit within one of its six categories in order to trigger the presumption.

▬ The burden thus shifted to IMDel to rebut the presumption by clear and convincing evidence, and it understandably emphasizes the "not otherwise permitted by law" language in subsection (a). This phrasing is confusing at best, and we have had considerable difficulty explaining what it means. *See Borger Management, Inc. v. Sindram,* 886 A.2d 52, 61 (D.C.2005) ("Admittedly this language is difficult to construe."); *DeSzunyogh v. William C. Smith & Co.,* 604 A.2d 1, 4 (D.C.1992) ("We can understand the trial court's difficulty in applying this language."). Drawing upon this language, we declared in *Wahl v. Watkis,* 491 A.2d 477 (D.C.1985), that "[t]he retaliation statute is applicable only where a landlord takes an action not otherwise permitted by law." *Id.* at 480. IMDel relies upon *Wahl* and upon the fact that the Rent Administrator approved issuance of the 120–day notices to argue that its actions could not have been retaliatory because they were permitted by law.

▬ This argument reads the statute too narrowly. In cases subsequent to *Wahl,* we have clarified that "if a tenant alleges acts which fall under the retaliatory eviction statute, [now codified at D.C.Code § 42–3505.02 (2001)], the statute by definition applies, and the landlord is presumed to have taken 'an action not

---

**15.** For example, the tenants argue that the presumption was triggered because they filed the TOPA case less than six months before IMDel served the 120–day notices which underlie this case. IMDel responds that it

served the initial round of notices (later found to be defective) *before* the TOPA suit was filed, thus establishing that it was not reacting to the filing of that suit. We need not reach this issue.

otherwise permitted by law' unless it can meet its burden under the statute." *DeSzunyogh,* 604 A.2d at 4. Moreover, our cases have established that the retaliation defense to eviction is not limited to situations where the landlord acts illegally. In other words, a retaliatory motive may "taint" an action that would otherwise be lawful. *Cf. Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 367 (D.C.1993) (The District of Columbia Human Rights Act "contains no safe harbor for otherwise lawful acts done for an improper retaliatory purpose.")

In *DeSzunyogh,* for example, the tenant had admitted a breach of her lease agreement, and the trial court directed a verdict, precluding her from presenting a defense of retaliatory eviction. 604 A.2d at 1. We held that this was error. The tenant had presented sufficient evidence to trigger the presumption of retaliation, and it became the landlord's burden to show "with clear and convincing evidence … that its actions were not retaliatory in nature." *Id.* at 4. "Whether [the tenant's] breach of lease covenants was justified remain[ed] an issue to be addressed at trial in the context of the retaliatory eviction claim. In rebuttal [the landlord] may present evidence of its lawful purposes for seeking appellant's eviction." *Id.* (footnote omitted).

Similarly, in *Youssef v. United Management Co.,* 683 A.2d 152 (D.C.1996), a landlord facing a claim of retaliatory eviction "responded that these tenants were evicted for violating the terms of their lease agreement." *Id.* at 155. We reversed a judgment in favor of the landlord, explaining that "[w]hile it may be that United Management and Cowan [the manager and owner of the building, respectively] had a basis in the lease to evict the tenants, under § [42–3505.02], the Youssefs get the benefit of the statutory presumption that the action was retaliatory 'unless the housing provider comes forward with clear and convincing evidence to rebut this presumption.'" *Id.* We did not address the issue "of what evidence will serve to overcome the statutory presumption." *Id.* at 155 n. 5.

There is much to say on IMDel's side of the debate, but the uncontroverted facts in this record are sufficient to trigger the statutory presumption. It is not clear to us that the trial court gave the tenants the benefit of that presumption. Moreover, on this record, we cannot hold as a matter of law that IMDel has "come[ ] forward with clear and convincing evidence to rebut [the] presumption" of retaliatory action. D.C.Code § 42–3505.02(b) (2001). The fact that the Rent Administrator "determine[d] that these improvements [to the building] cannot be safely or reasonably accomplished while the rental units are occupied[,]"[16] may be important evidence that the evictions were necessary, but it is not, without more, enough to preclude a finding that the action was retaliatory.[17]

---

16. To support this conclusion, IMDel submitted documents which stated that the heating and hot water systems needed to be replaced and that lead paint and asbestos would be removed.

17. IMDel argues that, "[i]nasmuch as the provisions of the Rental Housing Act relating to retaliation are part of the statutory scheme which is administered by the Rent Administrator, the Rent Administrator's authorization to [IMDel] to serve the 120 Day Notices is a clear pronouncement that [IMDel's] actions were not retaliatory." We reject this argument. There is no indication in her letter of authorization that the Rent Administrator even considered the issue of retaliation. *Cf. Miller v. District of Columbia Rental Housing Comm'n,* 870 A.2d 556, 557 (D.C.2005) (noting that the Rental Housing Commission upheld an administrative law judge's finding of statutory retaliation by a housing provider against a tenant). One obvious reason for

It may be, as IMDel asserts, that the tenants have not proffered any evidence to support their allegations of retaliatory intent, which they ordinarily would have to do. *See Donohoe & Drury, Inc. v. Crowther,* 108 Daily Wash. L. Rptr. 2405, 2411 (D.C.Super.Ct. Nov. 25, 1980) (Schwelb, J.) ("Retaliatory eviction is an affirmative defense to an action for possession, and the burden of proof is on the tenant."). In this case, however, the statutory presumption relieves the tenants of the burden of establishing a *prima facie* case of retaliatory action. *See Miller v. District of Columbia Rental Housing Comm'n,* 870 A.2d 556, 559 (D.C.2005) ("That presumption ripens automatically into a conclusion of retaliation unless the housing provider rebuts the presumption by clear and convincing evidence.").[18] In order to rebut this presumption, the landlord must, at a minimum, come forward with a legitimate, non-retaliatory reason for the challenged action. *See Robinson v. Diamond Housing Corp.,* 150 U.S.App. D.C. 17, 29, 463 F.2d 853, 865 (1972) ("Once the presumption is established, it is then up to the landlord to rebut it by demonstrating that he is motivated by some legitimate business purpose rather than by the illicit motive which would oth-

erwise be presumed."). But when the statutory presumption comes into play, it will not suffice merely to *articulate* a legitimate, non-retaliatory reason, because the legislature has assigned a substantial burden of proof ("clear and convincing evidence") to the landlord. D.C.Code § 42–3505.02(b) (2001).

IMDel argues that it did not engage in retaliation, and thus has rebutted the statutory presumption, because it did not single out the appellants for special treatment; rather, it sought possession of every occupied dwelling unit in the building. IMDel asserts that appellants "only represent 17 households in the 57 unit Property . . . [and] that 22 households voluntarily vacated the Property, including those who were not on a rent strike, including those who were not members of the tenants association, and including those who did not complain about housing code violations." There is a great deal of force to this argument, but it was not made in the motion for summary judgment and, so far as we can tell from the record, it is not based on undisputed facts.

We therefore conclude that litigation on the defense of retaliatory eviction ended prematurely.[19] The judgments of posses-

---

this omission is that the tenants had no notice that IMDel was requesting authorization to issue the 120–day notices and thus were not able to raise a claim of retaliation.

18. The concept of retaliatory eviction as a defense to a landlord's action for possession derives in this jurisdiction from *Edwards v. Habib,* 130 U.S.App. D.C. 126, 397 F.2d 687 (1968), and was later codified. In *Edwards* the court cautioned: "This is not, of course, to say that even if the tenant can prove a retaliatory purpose she is entitled to remain in possession in perpetuity." *Id.* at 141, 397 F.2d at 702. For example, "[i]f th[e] illegal purpose is dissipated," *id.,* the landlord may be able to evict. *See generally,* Mark S. Dennison, *Tenant's Rights and Remedies Against Retaliatory Eviction by Landlord,* 45 Am.Jur.

PROOF OF FACTS 3D 375, § I.E. (Landlord's Defense of Retaliatory Eviction Claim) (1998).

19. We have said in another context that a claim of "a retaliatory motive is a question of fact for the jury (or the judge in a non-jury trial), and, like other types of claims in which motive or intent is in issue, is not well suited to disposition on a motion for summary judgment." *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 368 (D.C.1993) (referring to a claim of retaliatory action under the DCHRA); *see Edwards, supra* note 18, 130 U.S.App. D.C. at 141, 397 F.2d at 702 ("The question of permissible or impermissible purpose is one of fact for the court or jury . . . ."). We have said the same thing about claims of discrimination, *see, e.g., Hollins v. Federal National*

sion are vacated, and these cases are remanded to the Superior Court for further proceedings consistent with this opinion.[20]

### VI. Conclusion

For the reasons stated, in Nos. 06–CV–1150 and 06–CV–1387, we affirm the judgment in favor of the defendants on the CPPA claim. We vacate the Sale Act judgment, and remand that claim for further proceedings. In the remaining appeals, we vacate the judgments granting possession to IMDel and remand those cases for further proceedings.

*So ordered.*

---

*Mortgage Ass'n*, 760 A.2d 563, 579–80 (D.C. 2000), but we have, on occasion, upheld a trial court grant of summary judgment in favor of a defendant accused of discrimination. *See, e.g., Hamilton v. Howard University*, 960 A.2d 308, 315–16 (D.C.2008); *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 799 A.2d 381, 386 (D.C.2002); *Hollins*, 760 A.2d at 571. We therefore do not foreclose the possibility that, on a properly supported record, the trial court may dispose of a defense of retaliatory eviction at the summary judgment stage. When the statutory presumption of retaliatory action has been triggered, however, the record would have to establish, under the standards that govern summary judgment, that the landlord has rebutted it by clear and convincing evidence.

20. The parties debate two other issues that we need not address. The tenants argue that proceedings before the Rent Administrator were flawed for several reasons, including that IMDel should have proceeded under Section 501(h) of the Rental Housing Act, D.C.Code § 42–3505.01(h) (2001), instead of Section 501(f), D.C.Code § 42–3505.01(f) (2001). The trial court did not expressly rule on these issues, and we express no opinion on them. We do note, however, that if these issues are litigated on remand, and come before us again, it would be helpful to have the official views of the District of Columbia on how these portions of the statute are properly interpreted. This could be accomplished by inviting the District to participate as *amicus* if and when these issues are considered on remand.

The tenants also argue that, if we were to affirm the trial court's order granting summary judgment to IMDel, we should modify the order to permit them to return to the building once renovations are completed. This request is made "only in the alternative," however, and we do not reach it. Apart from the legal complexities of whether that right has been forfeited by the tenants' conduct, the feasibility of granting such relief undoubtedly has been affected by intervening events.