Janice MAGWOOD, Appellant,

v.

Tyrone GIDDINGS, et al., Appellees.

No. 93–CV–1302.

District of Columbia Court of Appeals.

Argued Nov. 20, 1995.

Decided March 14, 1996.

Shelah Fidellman Lynn, Bethesda, MD, for appellant.

Richard Bergeron, Assistant Corporation Counsel, with whom Garland Pinkston, Jr., Acting Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, and Janet L. Maher, Deputy Corporation Counsel, were on the brief, for appellees.

Before STEADMAN, KING, and REID, Associate Judges.

KING, Associate Judge:

On the evening of August 4, 1991, Janice Magwood was taken into custody and involuntarily transported to the emergency room of D.C. General Hospital by a mental health specialist employed by the District of Columbia, who applied for her admission to St. Elizabeth's Hospital for observation and diagnosis as a suicide risk. Magwood appeals from the trial court's dismissal of her claims arising from that incident filed against the appellees, Kenneth Freeman, Tyrone Gid-

dings, and the District of Columbia ("District appellees") for false imprisonment, intentional infliction of emotional distress, negligence, and battery.

After a hearing, the trial court dismissed Magwood's claims, setting forth alternative grounds for doing so.[1] The trial court also granted the defense motion for summary judgment, ruling that there were no disputed material facts on the question whether Magwood was detained pursuant to lawful authority under D.C.Code § 21–521 (1989 Repl. & 1995 Supp.). Because we conclude that the trial court did not err in resolving this matter on the latter basis, we affirm.

## I.

The trial court may enter summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c) (1989); *see Young v. Delaney*, 647 A.2d 784, 788 (D.C.1994); *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C.1991). This court conducts an independent review of the record, in the light most favorable to the non-moving party, and applies the same standards as the trial court. *See Sherman v. District of Columbia*, 653 A.2d 866, 869 (D.C.1995); *Graff v. Malawer*, 592 A.2d 1038, 1040 (D.C.1991). Once a moving party makes an initial showing that the record presents no genuine issue of material fact, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *See Beard, supra,* 587 A.2d at 198. Conclusory allegations are insufficient to defeat an entry of summary judgment. *Id.* at 199 (citing Super.Ct.Civ.R. 56(e)). The court "may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are asserted to be actually in good

---

1. The trial court ruled, alternatively, that (1) notice to the District, as required under D.C.Code § 12–309 (1995 Repl.), was insufficient; (2) the District and the individual defendants were immune under the public duty doctrine; and (3) the individual defendants had absolute immunity under the statutory provisions and procedures of D.C.Code §§ 21–521–28. Because we affirm on other grounds, we do not address any of these issues.

faith controverted in a statement filed in opposition to the motion." Super.Ct.Civ.R. 12–I(k) (1995).

## II.

Viewed in the light most favorable to Magwood, the record shows that, in August of 1991, Magwood telephoned Tyrone Giddings, whom she had met when they both worked at D.C. General Hospital. Several months earlier Magwood and Giddings briefly dated, but they had not been dating for three months when the phone call was made. During the telephone conversation, Magwood indicated that she was suffering from premenstrual syndrome ("PMS"), and was "a little down," but was not depressed. At some point during this conversation, Giddings, who had become concerned that Magwood might harm herself, requested Kenneth Freeman, who was employed by the Commission on Mental Health Services as a Mental Health Specialist at the Emergency Psychiatric Response Division ("EPRD"), to listen to the conversation by way of a three-way telephone mechanism. As a Mental Health Specialist at EPRD for over five years, Freeman was authorized and assigned to evaluate persons' mental condition and detain them if he determined a need for psychiatric intervention or emergency hospitalization.

In his affidavit accompanying the summary judgment motion, Freeman averred that he heard Magwood state an intention to kill herself, that she had told her sons that she would commit suicide, and that she had made plans for their future care. Freeman also heard Magwood state that she had recently begun reading books on suicide, that she wanted to go to sleep and not wake up, and that she did not "feel like going on." Magwood's affidavit in opposition claimed simply that she "never once stated that [she] wanted to kill [her]self nor that [she] had advised [her] sons that [she] intended to kill herself."

Within minutes of concluding his conversation with Magwood, Giddings appeared at Magwood's home. After protesting that she was ready for bed and did not want company, Magwood agreed to let Giddings inside her home and the two spoke for a few minutes. When Magwood opened the door to let Giddings out, however, Freeman and an assistant pushed their way into Magwood's home. With the help of Giddings and the assistant, Freeman restrained Magwood until members of the Metropolitan Police Department arrived. Magwood was taken to D.C. General Hospital, where Freeman completed an application for Magwood's emergency hospitalization. In the application for emergency hospitalization, Freeman explained that he believed Magwood to be mentally ill and that he had taken her into custody in part because she "threatened suicide [two times]," stated that she wanted to "go to sleep and not wake up," and stated that she did not "feel like going on."

While at the emergency room at D.C. General Hospital, Magwood was placed on a gurney with arm and leg restraints, and intravenously tested for drugs. Magwood told the examining physician that she was "feeling down" after breaking off a relationship with a boyfriend. The treating physician, noting that Magwood seemed "preoccupied with her misfortunes" and stared "blankly into space," determined that Magwood was suicidal and suffering from depression. Early the next morning Magwood left D.C. General Hospital without being formally discharged. She was then listed as an escapee and the police were notified.

Later the same day, the police again took Magwood into custody pursuant to the application for emergency hospitalization and transported Magwood to St. Elizabeth's Hospital. Magwood voluntarily, although she claims under protest, requested examination by a psychiatrist and admission into the hospital if needed. After being examined by the admitting psychiatrist on duty, Magwood was admitted as a voluntary patient on August 6, 1991. She was discharged from St. Elizabeth's Hospital on August 7, 1991.

Magwood's amended complaint sought damages from Giddings, Freeman, and the District of Columbia for false imprisonment, intentional infliction of emotional distress, negligence, and battery. Magwood alleged that Giddings and Freeman acted within the scope of their duty as employees for the District of Columbia, and sued the District as

their employer. Alternatively, if it was determined that either Giddings or Freeman acted outside the scope of their employment, Magwood alleged that they were liable as individuals for abusing their positions as health care workers. The trial court granted the District appellees' Motion to Dismiss and it entered summary judgment in the District appellees' favor. This appeal followed.

### III.

██ We first turn to Magwood's claim of false imprisonment. For a claim of false imprisonment to succeed, there must be an *unlawful* detention. *See Jackson v. District of Columbia,* 412 A.2d 948, 954 (D.C.1980). If a person detains another with the authority of law, he cannot be liable in tort for the reasonable exercise of that authority. For example, it is a familiar principle that probable cause for an arrest and detention constitutes a valid defense to a claim of false arrest or imprisonment. *See, e.g., Gabrou v. May Dep't Stores Co.,* 462 A.2d 1102, 1104 (D.C. 1983); *Wade v. District of Columbia,* 310 A.2d 857, 862 (D.C.1973) (en banc).

In this case, the District appellees claim their authority for detaining Magwood derives from § 21–521 of the District of Columbia Code, which provides:

> An accredited officer or agent of the Department of Human Services of the District of Columbia, or an officer authorized to make arrests in the District of Columbia, or a physician or qualified psychologist of the person in question, who has reason to believe that a person is mentally ill and, because of the illness, is likely to injure himself or others if he is not immediately detained may, without a warrant, take the person into custody, transport him to a public or private hospital, and make application thereto for purposes of emergency

observation and diagnosis. The application shall reveal the circumstances under which the person was taken into custody and the reasons therefor.

D.C.Code § 21–521 (1989 Repl. & 1995 Supp.).

It is undisputed that Kenneth Freeman, as an employee of the EPRD of the Commission of Mental Health Services, is an "agent of the Department of Human Services" ("DHS") pursuant to the statute. Thus, Freeman was authorized to take Magwood into custody, provided that (1) prior to assumption of custody, he believed that she was mentally ill and likely to injure herself or others if not immediately detained; (2) the belief was reasonable; and (3) he disclosed in the application for hospitalization the circumstances for which Magwood was taken into custody and the reasons therefor.[2] *See id.; see also Johnson v. United States,* 178 U.S.App.D.C. 391, 397, 547 F.2d 688, 694 (1976). If Freeman satisfied these conditions, he acted with the authority of law and cannot be liable for false imprisonment in initiating the detention of Magwood. *See Jackson, supra,* 412 A.2d at 954.

██ In his affidavit filed in support of the motion for summary judgment, Freeman explained that his basis for believing that Magwood was mentally ill and was likely to injure herself was that

> [d]uring the conversation, [Magwood] made unsolicited statements in which she stated an intention to kill herself. [Magwood] stated that she told her sons that she would commit suicide, and that she had made plans for their future care. In addition, [Magwood] stated that she had recently begun reading books on suicide, that she wanted to go to sleep and not wake up, and that she did not "feel like going on."[3]

2. Magwood does not contend that Freeman did not disclose, in the application for hospitalization, either the circumstances or his reasons for taking her into custody.

3. Freeman also stated in his affidavit that

In my capacity as a Mental Health Specialist and accredited Officer/Agent of DHS, I assess and evaluate persons regarding their mental condition, determine their need for psychiatric

intervention or emergency hospitalization and assessment by a psychiatrist.

On August 4, 1991, I received a telephone call from Mr. Tyrone Giddings. Mr. Giddings asks [sic] me to monitor a telephone conversation with [Magwood]....

In my five years of experience as a Mental Health Specialist, I have observed that persons who express suicidal ideation and make plans for their children's future care are seriously

We conclude, and Magwood's counsel conceded as much during oral argument, that the facts asserted in Freeman's affidavit, if uncontroverted, are sufficient to satisfy the requirements of the statute and therefore free Freeman of liability. Magwood maintains, however, that her affidavit contradicted Freeman's and, therefore, material issues of fact existed for the jury to resolve. A careful comparison of the affidavits, however, compels a different conclusion.

In her affidavit, Magwood recounted her telephone conversation in some detail, but only generally denied making suicidal statements, saying only that "[she] never once stated that [she] wanted to kill [her]self nor that [she] had advised [her] sons that [she] intended to kill [her]self." [4] Magwood's affidavit does not directly address the specific assertions regarding her and what she said as set forth in Freeman's affidavit, including Freeman's averment that: (1) she had made plans for her sons' future care; (2) she had recently begun reading books on suicide; (3)

she wanted to go to sleep and not wake up; and (4) she did not "feel like going on." [5] In this summary judgment context, the court is permitted to consider the facts asserted by Freeman as "admitted," except to the extent that such facts are "actually controverted" in Magwood's opposition. *See* Super.Ct.Civ.R. 12–I(k) ("In determining any motion for summary judgment, the Court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are asserted to be actually in good faith controverted in a statement filed in opposition to the motion.").

■ Therefore, even viewing the affidavits in the light most favorable to Magwood, it remains uncontroverted, as set forth in Freeman's affidavit, that Magwood said that (1) she had made plans for her sons' future care; (2) she had recently begun reading books on suicide; (3) she wanted to go to sleep and not wake up; and (4) she did not "feel like going on." [6] After hearing these statements, Free-

---

considering suicide. Based upon [Magwood's] statements and my experience and training in the mental health field, I determined that plaintiff was at a high risk of suicide and should be evaluated by a psychiatrist. . . .

[Magwood] was taken into custody pursuant to my statutory authority under D.C.Code § 21–251 (the "Ervin Act") and transported to D.C. General Hospital for medical clearance prior to evaluation by a psychiatrist at St. Elizabeths Hospital. However, while at D.C. General Hospital, [Magwood] escaped custody, and I directed the Metropolitan Police to take plaintiff into custody and return her to EPRD for a psychiatric evaluation.

4. Magwood's affidavit stated as follows:

I asked if I could borrow the money for school and Mr. Giddings indicated that he did not have the money as he had recently paid for his daughter's college tuition. We talked about his daughter and the school she was attending. I mentioned that I was a little down as a result of the PMS. It was then that Mr. Giddings attempted to put words in my mouth. He kept saying "are you depressed?" and I kept saying no that I was just in a bad mood. When I asked what if anything he knew about "xanex" (which I do not believe I pronounced correctly), one (1) of the prescriptions given to me by my doctor, Mr. Giddings kept asking me if I meant "Ritalin," which sounded nothing like "xanex." During this part of the conversation there was a clicking on the phone and Mr. Giddings said it was his sister on the other line calling from the airport

for him to pick her up. He then said he would call me back, which he did. When he called me back, he said he would pick up his sister and be over to my house in fifteen (15) minutes. I said no that I was tired and wanted to go to sleep as I had to get up early. He asked where my sons were and I said they were staying with their father, as they usually do during summers and holidays. I never once stated that I wanted to kill myself nor that I had advised my sons that I intended to kill myself.

5. Although hardly determinative, we note in passing that another of Freeman's statements was not strictly contradicted by Magwood: Freeman's affidavit stated that Magwood "made unsolicited statements in which she stated an intention to kill herself" while Magwood denied that she said that she *wanted* to kill herself.

6. We also note that Magwood did not deny statements made in hospital records, which were attached to the motion for summary judgment, in which medical personnel wrote that Magwood admitted making statements about suicide. For example, the hospital records reported that Magwood stated: "I called my friend to talk to him—I have PMS—I was talking about suicide but I didn't mean it." In another hospital record, Magwood is reported as saying that "she expressed suicidal thoughts to her boyfriend last evening over the phone but minimizes them now saying it was because of PMS and 'if I was talking to my girlfriend I would have laughed

man concluded, based on his experience and training from which he knew that "persons who express suicidal ideation and make plans for their children's future care are seriously considering suicide," that Magwood was at a high risk of suicide and should immediately be evaluated by a psychiatrist. Objectively, Magwood's uncontroverted statements, as related by Freeman in his affidavit, support such a conclusion.[7] Therefore, given Freeman's experience and the uncontroverted statements, we cannot say that Freeman's belief was unreasonable.[8]

Accordingly, we conclude, based on the uncontroverted assertions in Freeman's affidavit, that there is no material factual dispute relative to a sufficient basis for Freeman believing that Magwood was mentally ill and posed a danger to herself. *See* Super.Ct.Civ.R. 12–I(k) (court may assume that facts as claimed by the movant "are admitted to exist without controversy" except to the extent that such facts are in good faith controverted in a statement filed in opposition to the motion for summary judgment). On the undisputed facts, Freeman, prior to assumption of custody, believed that Magwood was mentally ill and likely to injure herself if not immediately detained, and his belief was reasonable. Freeman was, therefore, statutorily empowered to detain Magwood and initiate her emergency hospitalization, and he cannot be liable for false imprisonment for that action. *See* D.C.Code § 21–521; *Johnson, supra*, 178 U.S.App.D.C. at 397, 547 F.2d at 694; *see also Jackson, supra*, 412 A.2d at 954. Therefore he was entitled to a judgment as a matter of law on the false impris-

onment claim. *See* Super.Ct.Civ.R. 12–I(k) and 56(c); *Beard, supra*, 587 A.2d at 198.

### IV.

We now turn to Magwood's claims for intentional infliction of emotional distress, negligence, and battery. Because Magwood's detention was based on lawful authority, she could prevail on these claims only if the District's employees used excessive force to detain her. *Cf. Jackson, supra*, 412 A.2d at 956 (arresting officer may use reasonable force to maintain lawful arrest). Magwood's amended complaint alleges only that she was restrained from behind and, while she resisted, she suffered "minor bruises" on her legs and knees, and suffered "mental pain[,] anguish and emotional distress." Thus, Magwood failed to allege force above and beyond that necessary to lawfully detain her. Although Magwood alleged that the District appellees' actions "were so outrageous and extreme that defendants knew or should have known that such conduct which falsely imprisoned [Magwood] would cause [Magwood] extreme mental anguish and emotional distress," nowhere in her opposition to the summary judgment motion does Magwood allege facts in support of those allegations, and such conclusory allegations are insufficient to defeat summary judgment. *See Beard, supra*, 587 A.2d at 198. Accordingly, Magwood's claims for intentional infliction of emotional distress, negligence, and battery were properly resolved in favor of Freeman. *Cf. Gabrou, supra*, 462 A.2d at 1105 (appellant could not prevail on claims for battery and infliction of emotional distress based on

---

and we would have talked about something else.' ... says this was a mistake, boyfriend overreacted."

7. Moreover, because § 21–521 authorizes Freeman's actions if his belief in Magwood's need for immediate hospitalization was reasonable, our examination is an objective one: whether it reasonably appeared to Freeman that Magwood was suicidal and therefore in need of immediate emergency hospitalization. As discussed above, we determine that it did.

8. Even if Giddings had a sinister motive in requesting Freeman to evaluate Magwood's con-

versation, and there is no evidence that was the case, there is no indication in the record that Freeman shared any such motive.

Magwood did not allege in her complaint, aver in her affidavit, or argue in her opposition to the motion or in her brief in this court, that Freeman was being dishonest about the four uncontradicted statements. Because Magwood did not question Freeman's credibility, the court may not create such an issue for the jury. *See Alger Corp. v. Wesley*, 355 A.2d 794 (D.C.1976) (court has no obligation to read into record issues that are not expressly raised).

lawful arrest where he did not allege excessive force).[9]

For all of these reasons, the judgment of the trial court is

*Affirmed.*

---

**9.** The District, as Freeman's principal, is not liable under any theory because, as we conclude, Freeman acted reasonably and within his lawful authority. *See* D.C.Code § 21–521; *see also Johnson, supra,* 178 U.S.App.D.C. at 397 n. 42, 547 F.2d at 694 n. 42. Likewise, Giddings cannot be liable as an employee of the District. Nor could Giddings be liable in an individual capacity, as it is undisputed that Giddings did not personally apply to have Magwood involuntarily admitted to the hospital; he merely asked Freeman to monitor a telephone call. Nothing in the record suggests that Freeman did not make an independent evaluation of Magwood. Thus, Magwood could not establish that Giddings's actions were the proximate cause of any harm. *See Powell v. District of Columbia,* 634 A.2d 403, 406 (D.C.1993) (claim of negligence requires showing that breach of a duty proximately caused damage to plaintiff).