Michael ANTHONY, Appellant,

v.

OKIE DOKIE, INC., Appellee.

No. 07–CV–134.

District of Columbia Court of Appeals.

Argued Oct. 2, 2008.
Decided July 30, 2009.

Jack Gold, for appellant.

James C. Mehigan, Washington, DC, and Angela W. Russell, Baltimore, MD, for appellee.

Before REID, GLICKMAN, and KRAMER, Associate Judges.

KRAMER, Associate Judge:

Appellant Michael Anthony challenges the trial court's orders granting summary judgment to appellee Okie Dokie, Inc. ("Okie Dokie") and denying appellant's motion for reconsideration of its order granting summary judgment. We reverse the trial court's grant of summary judgment and remand the case for trial.

## I. Factual Background

The factual background underlying this appeal is as follows.

### A. August 9, 2003 altercation

In the early morning hours of August 9, 2003, Anthony and four companions approached the Dream Nightclub ("Dream") in a vehicle. While outside of Dream, they were stopped behind a vehicle that was blocking them. In that vehicle was a woman talking to one or two men dressed in black who were standing outside of it. Several other men dressed in black were on the sidewalk near the stopped vehicle directing traffic with flashlights. Andre Jones, one of the occupants of Anthony's

vehicle, approached the stopped vehicle to ask what was happening. One of the men in black showed Jones that he had a gun and another sprayed him with mace. A third man in black spoke into a walkie talkie, and immediately thereafter several other men came running from the front of Dream. Anthony and his companions got out of the car and a fight began, with several of the men in black circling around Anthony. He eventually broke loose and ran from Dream, but was chased down the street by at least one of the men involved in the fight and hit in the head with something that he described as a nightstick. The only person other than Anthony who was identified as involved in the fight was Jerrell Reeves, a security guard involved in the initial encounter that occurred immediately outside of Dream, and who called other security personnel for assistance. Reeves was an employee of Ink Reinforcement Agency, Inc. ("INK"), which provided security in the area outside of Dream. Anthony has alleged that as a result of being struck with the nightstick, he suffered severe and permanent head injuries.

## B. Security at Dream

Okie Dokie, the corporate designation for Dream, provided its own security inside Dream. As of August 2003, each inside security guard wore a black suit and a pin that said "Dream" and carried a walkie-talkie. Security personnel were prohibited from carrying weapons or items such as mace, and were searched when they came into work to ensure that they were not carrying those items. Until May 2002, police officers from the Metropolitan Police Department ("MPD") had provided security outside of Dream, and Okie Dokie reimbursed the Department for that service.

In May 2002, Okie Dokie contracted with INK to provide security outside of Dream. INK was owned by a man named Jason Harris. Marc Barnes, the owner of Dream, hired INK because of his relationship with Harris. Barnes assumed that because Harris had worked indoor security at the District's Convention Center he had the experience to handle the security at Dream. Barnes' understanding of Harris' position at the Convention Center was that he worked in his individual capacity, rather than as someone who hired other people. When Okie Dokie hired INK to provide outside security at Dream, Barnes did nothing to confirm whether Harris had actually done security work at the Convention Center, nor did he obtain a resume from Harris, perform a background check on Harris, confirm whether INK was properly licensed in the District or inquire whether INK would perform background checks on its security personnel.

In July 2002 Okie Dokie and INK entered into an indemnification agreement which stated that they would "maintain an independent contractor relationship pursuant to which [INK] provides certain security and automobile traffic-control services to [Okie Dokie] in connection with [Okie Dokie's] management and operation of Dream." The agreement also stated that "[t]here is no intention to create by this Agreement an employer-employee or agency relationship between [INK] and [Okie Dokie]."

In his deposition Barnes described the reason that different security is needed outside the club than inside the club:

> Q: When you decided that security ... was needed outside the club because of the neighborhood ... why didn't you use the security that Dream Nightclub already had on staff or expand the internal security? What was it that made you decide to use an outside vendor?
> A: It is two different elements. The people that I guess I was dealing with are a different type of people than the

people [Harris] would deal with. We had the police, first. We thought that was the right type of security for the streets, actually.

Q: Is that, generally speaking, because the security that was needed outside the club was, you know, more in the line of preventing sometimes violent crimes as opposed to monitoring patrons? . . . .

A: Exactly. It is a different type of person that lives in the neighborhood that may be dealing with something else . . . [Outside security] were more, I guess you can say, street savvy where they could deal with the type of guy that, you know, was in that neighborhood, I guess you can say.

Barnes also testified that if he noticed that an INK employee looked sloppy, he might ask the employee to improve his appearance. Dream personnel would communicate with Harris or other INK personnel if a patron was intoxicated or had been in an altercation and needed to be walked to their cars. As for payment, Harris would submit a bill to Okie Dokie every week and Okie Dokie would pay INK the amount owed for its services. On May 14, 2004, there was a shooting involving an INK employee, and at that point Okie Dokie and INK mutually parted ways. Since then, the police have again provided security outside of Dream.

Barnes testified that Okie Dokie wanted INK personnel to dress in a uniform way.[1] It is unclear what INK personnel wore in August 2003, but they were instructed to dress alike and, at some point, INK security wore black shirts and black pants.

### C. Trial court proceedings

Anthony's complaint alleged two counts: one for assault and battery and the other for negligence, including negligent hiring and supervision. Although the original complaint named only Okie Dokie as a defendant, Anthony later amended his complaint to add INK as a defendant. INK failed to file a responsive pleading or appear in court, so a default was entered against it. Okie Dokie moved for summary judgment on the grounds that (1) Anthony cannot prove that his assailants were employees or agents of Okie Dokie, (2) Anthony failed to name a security expert and cannot prove his case without the testimony of such an expert, and (3) Okie Dokie owed no duty to Anthony since his injuries were sustained off Dream's premises.

In his opposition to summary judgment, Anthony argued that genuine issues of material fact exist regarding whether there was an "independent contractor" relationship between Okie Dokie and INK, and that no expert testimony was necessary. The trial court granted Okie Dokie's motion for summary judgment on the ground that Anthony had not offered evidence sufficient to show that the people who assaulted him were employees of INK or that linked INK employees to Okie Dokie. Anthony moved for reconsideration of the trial court's decision to grant summary judgment, and the motion was denied.

### II. Standard of Review

This court reviews grants of summary judgment motions *de novo* and applies the same standards as the trial court. *Mag-*

---

1. Q: Do you know whether [INK security personnel] wore a uniform or were required to wear something that was similar?

    A: I think they were all trying to do something that was similar. . . . [O]ur thing was get some type of uniform situation and be neat. . . .

    Q: If I understand you correctly—if I don't, please tell me—as long as they were more or less uniform and they were neat in appearance, that was acceptable to you?

    A: That was acceptable.

*wood v. Giddings,* 672 A.2d 1083, 1084 (D.C.1996). Summary judgment is appropriate

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. This court conducts an independent review of the record, in the light most favorable to the non-moving party.... Once a moving party makes an initial showing that the record presents no genuine issue of material fact, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial.

*Id.* (citations and internal quotation marks omitted). The party moving for summary judgment can satisfy its burden by establishing a lack of evidence to support the plaintiff's case. *Potts v. District of Columbia,* 697 A.2d 1249, 1251 (D.C.1997). *See also Varner v. District of Columbia,* 891 A.2d 260, 265 (D.C.2006) ("Summary judgment is proper when a party fails to establish an essential element of his case upon which he bears the burden of proof." (citation omitted)). The party opposing the motion "may not rest upon the mere allegations contained in its pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Potts, supra,* 697 A.2d at 1251 (citations and internal quotation marks omitted). "[A] motion for summary judgment should be granted if (1) taking all reasonable inferences in the light most favorable to the nonmoving party, (2) a reasonable juror, acting reasonably, *could not* find for the nonmoving party, (3) under the appropri-

ate burden of proof." *Nader v. de Toledano,* 408 A.2d 31, 42 (D.C.1979).

### III. Legal Discussion

Anthony argues that the trial court erred in its order granting summary judgment to Okie Dokie on the grounds that Anthony had put forth no evidence that the people who assaulted him were employees of INK or were employed or controlled by Okie Dokie. To the contrary, he argues, he did put forth sufficient evidence to allow a reasonable fact-finder to find both that the people who injured him were INK employees, and that Okie Dokie was liable for the torts of INK employees. He also argues that the trial court erred in denying his motion for reconsideration of the order granting summary judgment.

### A. Whether the assailants were Okie Dokie or INK employees

■ In order to survive summary judgment, Anthony must put forth evidence that his assailants were Okie Dokie or INK employees. Looking at the facts in the record, we note that there was deposition testimony that Anthony's assailants were dressed in black and carrying flashlights and walkie-talkies. Barnes himself testified that Dream security wore black suits and carried walkie-talkies and flashlights, and that INK security at some point dressed in black shirts and pants. Additionally, there was testimony that Jerrell Reeves, an INK employee, was involved in the initial altercation with Anthony.[2] Both Anthony and Khalil Cotton, one of the occupants of Anthony's car, testified that Anthony was chased down the street by one or more of the men involved in the initial altercation right outside Dream.

---

**2.** Okie Dokie argued at oral argument that Barnes' testimony about Reeves' involvement in the altercation is inadmissible hearsay because Barnes did not see the fight and only heard that Reeves had been involved in the fight. Anthony, however, also testified that Reeves was involved in the fight and Barnes testified that Reeves was an INK employee.

Anthony identified them as "security," and they were dressed in the dark clothing that the record showed was the uniform at some point for INK security guards, as well as for Dream security guards. Moreover, they were described as having flashlights and walkie-talkies, items admittedly carried by the security guards. Thus, we conclude that there was sufficient evidence in the record to create genuine issues of material fact about whether Anthony was assaulted by INK security guards and accordingly, that the matter should have been permitted to go to a jury.

### B. Whether a master-servant relationship existed between Okie Dokie and INK employees

Although Anthony has put forth sufficient evidence for a reasonable factfinder to find that his assailants were INK employees, he also must put forth sufficient evidence to allow a reasonable factfinder to conclude that Okie Dokie is liable for the actions of INK employees. Generally, a company is not liable for the acts of its independent contractors. *See Washington Metro. Area Transit Auth. v. L'Enfant Plaza Props., Inc.*, 448 A.2d 864, 868 (D.C.1982) (citation omitted). A company is liable for the actions of a contracted security guard, however, if it has a master-servant relationship with the security guard. *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759 (D.C.2001) (citation omitted).

To determine whether a master-servant relationship exists between Okie Dokie and employees of INK, the following factors must be considered: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C.1982) (citation omitted).

The determinative factor "is whether the employer has the *right* to control and direct the servant in the performance of his work and the manner in which the work is to be done . . . . and not the actual exercise of control or supervision." *Id.* (emphasis and citations omitted). We focus on this factor not only because it is the most important, but also because the evidence about the other factors is inconclusive. "In analyzing an employer's right to control, we look to the . . . relationship between the parties and the language of [the] agreement between them, if any." *Beegle v. Rest. Mgmt., Inc.*, 679 A.2d 480, 485 (D.C.1996) (citation omitted). The language of an agreement is not, however, dispositive in characterizing the nature of the relationship between the parties. *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 423 (D.C.2006) (citations omitted). Here, the only agreement between Okie Dokie and INK in the record explicitly describes their relationship as an "independent contractor relationship."

Okie Dokie's right to control INK employees bears certain similarities to the level of control exhibited in *Kelly* by Safeway over security guards employed by a separate security agency, Seaboard, who worked at Safeway stores. The Safeway store manager "had operational control over the guards, who worked under his general direction." *Kelly, supra*, 448 A.2d at 861. As in this case, Safeway paid for the guards' services in a monthly lump sum payment to Seaboard. *Id.* Although Harris served as a go-between, communicating between Okie Dokie and INK employees, Okie Dokie personnel were able to direct the actions of INK security guards in a variety of ways. Dream personnel would communicate with Harris or other INK personnel if someone was intoxicated or had been in an altercation and needed to be walked to their cars. INK guards

dressed in a uniform manner because Barnes wanted it that way. Further, if Barnes noticed that an INK employee looked sloppy, he might ask the employee to improve his appearance.[3] Although it is a very close question, given all of these factors, we conclude that the evidence was sufficient to raise a genuine issue of material fact as to whether there was a master-servant relationship between Okie Dokie and the INK employees.[4] For that reason, the trial court erred in granting Okie Dokie's motion for summary judgment. Viewing the record in the light most favorable to Anthony shows that there are genuine issues of material fact concerning whether he was injured by INK security guards and whether there is a master-servant relationship between Okie Dokie and INK employees.

Accordingly, the matter must be reversed and remanded for trial.

*Reversed and remanded.*

3. With his motion for reconsideration, Anthony attached a deposition of Barnes from another case. This deposition included testimony that Barnes could instruct Harris to fire INK guards. The motion for reconsideration was not filed within the ten day limit of Super. Ct. Civ. R. 59(e) and Anthony has not established that he has met any of the reasons set out in Super. Ct. Civ. R. 60(b). *See Kibunja v. Alturas, L.L.C.,* 856 A.2d 1120, 1128 n. 8 (D.C.2004) ("A motion for reconsideration, by that designation, is unknown to the Superior Court's Civil Rules. The term has been used loosely to describe two different kinds of post-judgment motions … brought pursuant to Super. Ct. Civ. R. 59(e) [or] Super. Ct. Civ. R. 60(b)." (citation omitted)). While the deposition itself had been taken in a different case filed against Okie Dokie since the summary judgment motions had been filed, the trial court correctly pointed out that Anthony could have asked Barnes the same questions in the deposition that he took. Because this evidence was not before the trial court at the time it decided Okie Dokie's motion for summary judgment, this court may not consider it in our review of the summary judgment motion. *See id.* at 1128.

4. Since we reverse the summary judgment motion on the ground that there is sufficient evidence of a master-servant relationship between Okie Dokie and INK employees to raise a genuine issue of material fact, we find it unnecessary to reach Anthony's arguments regarding exceptions to the general rule that employers are not liable for the actions of independent contractors, nor to address whether the trial court erred in denying Anthony's motion for reconsideration.